UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

WILLIAM N. HARWIN

Case No. 20-CR-0115-JLB-MRM

DISPOSITIVE MOTION

**MOTION TO DISMISS THE INDICTMENT
FOR FAILURE TO STATE AN OFFENSE**

Dr. William Harwin, a 67-year-old medical oncologist who has saved countless lives in Florida over the course of his distinguished career, moves to dismiss the indictment brought against him and states:

The government's novel theory of prosecution relies on vagaries rather than specific factual allegations to greatly expand criminal liability under the Sherman Act without legal support. The indictment charges a *per se* violation of the antitrust laws. Such a violation is premised on an agreement between competitors. Yet, the indictment fails to allege (and could not allege) that medical oncologists and radiation oncologists are competitors. This case is as though the government charged a criminal lawyer, whose clients often also have immigration problems, with an antitrust crime for not competing with an immigration lawyer. The criminal lawyer and the immigration lawyer may refer clients to each other and may coordinate in many cases, but no one would say that they are unreasonably restraining trade by not entering each other's practice areas. There are good reasons for why that arrangement makes sense and does not unreasonably suppress competition. At bottom, the lawyers' services are *economic complements* not *economic*

1

*substitutes*, so they are not competitors, although both practice law and have some clients in common.

Dr. Harwin founded and headed Florida Cancer Specialists and Research Institute. He expanded it to treat thousands of Floridians at 94 locations in 27 of Florida's 67 counties. *See* DE1:2 ¶¶ 6–7. All 94 locations offered medical oncology treatments. Only eight of them offered radiation oncology services. *See* DE1:2 ¶ 6 ("In various locations in Florida, FCS provided both medical oncology treatments and radiation oncology treatments."). Lee, Collier, and Charlotte counties were not among the six counties where FCS offered radiation oncology services. *Id.* During the same period, another medical practice group, 21st Century Oncology, founded by Dr. Daniel Dosoretz, offered radiation oncology services, but not medical oncology services, throughout Florida, including Lee, Collier, and Charlotte counties. DE1:3 ¶ 8.

Based on those facts, the indictment accuses Dr. Harwin of having conspired "to suppress and eliminate competition by agreeing to allocate medical oncology treatments for cancer patients to FCS and radiation oncology treatments for cancer patients to Oncology Company A" in Southwest Florida. DE1:4 ¶ 14. The indictment claims that this alleged agreement was "a *per se* unlawful, and thus unreasonable" restraint of trade. DE1:4–5 ¶ 16. That, however, is a *legal conclusion*, not a *factual allegation*. This Court cannot consider it in deciding whether the indictment makes sufficiently specific factual allegations to charge a crime. *See* Fed. R. Crim. P. 12(b)(3)(B)(iii) & (v); *see United States v. Caco*, 2013 WL 6085134, No. 12-CR-91 (M.D. Fla. Nov. 19, 2013) ("An incorrect statement of law would certainly qualify as surplusage which should be stricken.").

The indictment does not plead the essential specific facts—such as, that medical oncologists and radiation oncologists are competitors—that would enable this Court to analyze the charged conduct using the *per se* approach to Sherman Act violations. The government does not rely on the alternative way to allege and establish a Sherman Act violation, the more broadly applicable rule of reason approach. The indictment is clear that it purports only to charge a *per se* violation; it does not even attempt to charge a rule of reason violation of the Sherman Act. Having gone all-in on a *per se* theory without alleging facts that would support the application of such a theory, the indictment fails to state an offense and must be dismissed.

WHEREFORE the indictment fails to allege specific facts that, if proven beyond a reasonable doubt, would establish a crime, and it must be dismissed.

*Certificate of Conference with Opposing Counsel*

Counsel for Dr. Harwin certifies that they have conferred with counsel for the government on this motion and it opposes.

**MEMORANDUM OF LAW**

Section 1 of the Sherman Act, 15 U.S.C. § 1, differs substantially from other federal criminal statutes in that the elements of the crime are not enumerated in the statutory text. Section 1 bars all concerted action that causes an unreasonable restraint of trade. This deliberate vagueness was meant to ensure that the Act could not be circumvented by devising new methods of stifling competition. "The statute under this view evidenced the intent ... to protect [interstate or foreign] commerce from being restrained by methods, whether old or new, which would constitute an interference,—that

is, an undue restraint." *Standard Oil Co. v. United States*, 221 U.S. 1, 60 (1911). Consequently, "the contracts or acts embraced in the provision were not expressly defined ... ." *Id.* Instead, the Act incorporated the common law phrase "restraint of trade," which meant *unreasonable* restraints of trade. *Id.* Courts were to use the common law's "standard of reason" to determine "whether, in a given case, a particular act had or had not brought about the wrong against which the statute provided." *Id.*

Because the statute differs in these ways from other federal criminal statutes, an indictment charging a § 1 Sherman Act violation cannot just parrot the statutory language. An indictment is legally sufficient only if it charges each element of the alleged offense with sufficient clarity to inform the defendant of what he must defend against and to plead double jeopardy in case of a successive prosecution. *Russell v. United States*, 369 U.S. 749, 763–64 (1962).  An indictment must "descend to particulars" so as to "inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* at 765. "In judging the sufficiency of the indictment, the court must look to the allegations and, taking the allegations to be true, determine whether a criminal offense has been stated." *United States v. Fitapelli*, 786 F.2d 1461, 1463 (11th Cir. 1986) (reversing convictions for violation of 15 U.S.C. § 1 where indictment failed to allege commerce element).

Concerted action violates § 1 if it was economically unjustified under the circumstances and harmful to competition. "The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1. 'Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive

4

practice should be prohibited as imposing an unreasonable restraint on competition.'" *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (citations omitted). The rule of reason inquiry is wide-ranging and complex. "An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607 (1972).

The Supreme Court identified a few practices that, in certain familiar contexts, are *per se* unreasonable and do not require a detailed analysis when they recur in a new case. *Per se* analysis cannot be applied to new industries or circumstances until sufficient judicial experience analyzing the restraint under the rule of reason shows it is nearly always anticompetitive in the circumstances. "[T]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather*, 551 U.S. at 886–87. Courts should be cautious about applying *per se* analysis to new markets or circumstances. "[T]he *per se* label should be applied infrequently and with caution." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016).

### THE INDICTMENT CHARGES NO CRIME BECAUSE IT ADVANCES A NOVEL THEORY OF *PER SE* ANTITRUST LIABILITY IN THE ABSENCE OF FACTUAL ALLEGATIONS

The indictment does not allege that medical oncology and radiation oncology are related in ways beyond serving an overlapping patient pool. It never, for example, alleges

that the relevant market for its charges is "general oncology in Lee, Collier, and Charlotte counties" *or* that medical oncologists and radiation oncologists are competitors in that market. Additionally, it never alleges facts to support its bare legal assertion that *per se* analysis applies in the circumstances. The failure of the indictment to make such allegations requires its dismissal.

The gravamen of this motion is that the government's indictment charges a crime only if the reader assumes certain facts that the indictment does not actually allege. To expose why the Court must require the government to allege specific facts, this memorandum footnotes relevant background information about medical oncology and radiation oncology, which the Court may judicially notice because it is readily verifiable and not subject to reasonable dispute. *See* Fed. R. Evid. 201 (providing that facts not subject to reasonable dispute may be judicially noticed at any stage). However, the indictment must be dismissed even if the Court declines to notice any facts (or even to read the footnotes) because the indictment is based solely on a legal conclusion that this is one of the rare circumstances in which *per se* analysis is legally applicable, unsupported by factual allegations necessary to reach that conclusion.

I. **The indictment does not allege that there exists a market for "oncology services" in which medical oncologists and radiation oncologists compete with each other, rather than two separate and distinct markets for medical oncology services and radiation oncology services.**

The first unstated, but false, premise of the indictment's contention that it is alleging a *per se* violation is that "general oncology" in Charlotte, Collier, and Lee counties is a relevant market. That such a market exists, however, must be alleged. In this

case, the government has not alleged that "general oncology" is a field of medicine.[1] It has also failed to allege why it cherry picked three Florida counties when it has failed to allege anything unique about these counties that would make them a separate market for "general oncology."[2]

The second, and more significant, unstated false premise is that medical oncologists compete with radiation oncologists in a "general oncology" market. Without that allegation, the indictment cannot survive dismissal because the *per se* analysis applies only to concerted action between competitors. "Typically only 'horizontal' restraints— restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2283–84 (2018) (citation omitted).

The fairest reading of the indictment's plain text is that it charges that Dr. Harwin committed a crime by agreeing not to expand his business to offer a complementary medical specialty outside of his core business and practice area in three counties of Southwest Florida.[3] Far from charging a crime, that theory is an unprecedented, baseless

---

[1] "Oncology" is not one field but three (which themselves have sub-specialties). All three fields are all called "oncology" only because they all treat cancer patients. That is where the similarities end. These distinct specialties evolved from different medical fields. Medical oncology is a specialization of internal medicine, while radiation oncology derived from radiology. The third specialty, surgical oncology (which the indictment does not mention), derived from surgery.

[2] The government's decision to focus on three counties where FCS offers medical oncology services but not radiation oncology services is misleading. FCS operates in only 27 of Florida's 67 counties and offers radiation oncology in only six of those.

[3] Medical oncology residency programs typically last six years. Radiation oncology residency programs are typically four years long and are among the most competitive in the country. Practically no doctor does both residencies, which means no doctor is qualified

7

expansion of the Sherman Act. It is not a *per se* violation of the Sherman Act for a medical specialist to agree not expand into a different medical specialty.[4] Because the indictment fails to allege that Dr. Harwin engaged in concerted action with any horizontal competitors, it fails to state the *per se* violation it purportedly charges.[5]

The indictment's recitation of the bare legal conclusion that *per se* analysis applies is no substitute for specific factual allegations, that, if proven at trial, would establish that legal claim—especially given that "the *per se* label should be applied infrequently and with caution." *Procaps S.A.*, 845 F.3d at 1083. The indictment must allege facts that would establish that the conduct alleged involved competitors in a relevant market.

II. **The indictment does not allege that territorial allocations between specialized healthcare services providers is the equivalent of territorial allocations in mass markets for consumer goods.**

Even if pleading legal conclusions sufficed, the allegations in this case would provide no occasion for applying the *per se* approach because the Supreme Court has

---

or able to practice both medical oncology and radiation oncology. There are separate, different training and board certifications for these specialties.

[4] Medical oncologists and radiation oncologists both treat cancer, but neither is qualified to do what the other does. That is why the vast majority of independent medical oncology practices like FCS generally do not also offer radiation oncology treatments. Most radiation oncology services are provided through large hospitals, which have the deep pockets to buy the expensive equipment needed and the physical space to keep it.

[5] What treatments a cancer patient needs depends on the type and severity of the patient's cancer. A patient may require treatment from one, two, or all three types of oncological specialists. A medical oncologist is generally responsible for administering chemotherapy, hormone therapy, and immunotherapy, as well as for coordinating treatment with other medical specialists across many fields. A radiation oncologist treats cancer using radiation therapy. A surgical oncologist is a surgeon who has special training in removing cancerous tissues and tumors and in diagnosing cancer through biopsies.

never held the conduct alleged in this case to be *per se* unreasonable. The Supreme Court has never considered whether horizontal territorial allocations between competitors in a healthcare services market should be analyzed under the usual rule of reason or using the *per se* approach. The Court has held only that allocating territories in a market for mass-manufactured goods is a *per se* Sherman Act violation. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (*per curiam*); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08 (1972); *United States Sealy, Inc.*, 388 U.S. 350, 354–55 (1967).

The indictment's allegation of a *per se* violation is premised on the dubious assumption that what is true about mass-produced consumer goods must be true in a market for the provision of specialized medical services. The Supreme Court's decisions not only fail to support that assumption, they undercut it. The factual allegations in this case, to the extent they could state an offense, do not describe one to which the *per se* approach applies. Rather, the alleged conduct must be analyzed under the rule of reason.

Each of the Supreme Court's territorial allocation cases involved mass-produced consumer goods. In *Palmer*, the two former competitors that marketed bar examination review books and recorded lectures to prospective lawyers agreed not to compete in Georgia but to join forces and share revenue. In *Topco Associates*, several small grocers joined together to create private-label products that each grocer had the exclusive right to sell in its area. Similarly, in *Sealy*, various bedding manufacturers created the Sealy brand and had exclusive use of it within a territory. Such agreements raise a red flag in mass products markets because, without exclusive territories, manufacturers will service all markets they can, produce more goods to do so, and thus push prices down and offer

consumers more choices.

Accordingly, in each case, the Court reasoned that the territorial allocation was tantamount to horizontal price-fixing, the quintessential *per se* unreasonable restraint, because the conspirators were competing in selling identical or interchangeable products to consumers.[6] In *Palmer*, the Court noted that the publishers' revenue-sharing agreement "coupled with the price increase that took place immediately after the parties agreed to cease competing with each other in 1980, indicates that this agreement was 'formed for the purpose and with the effect of raising' the price of the bar review course." 498 U.S. at 49; *see also Procaps*, 845 F.3d at 1083. In *Topco*, the Court found that the grocers' "provisions for exclusivity work effectively to insulate members from competition in Topco-brand goods." 405 U.S. at 602. *Sealy* likewise held that "[t]he territorial restraints were a part of the unlawful price-fixing and policing. As specific findings of the District Court show, they gave to each licensee an enclave in which it could and did zealously and effectively maintain resale prices, free from the danger of outside incursions." 388 U.S. at 356.

The indictment in this case, in contrast, says absolutely nothing about FCS's ability to fix prices as a result of the alleged territorial allocations. FCS does not sell mass-produced goods; nor by and large does it sell to consumers at all. Medical practices receive their revenue from third-party payors, private insurance carriers and

---

[6]Medical oncology and radiation oncology are not interchangeable and are therefore not economic substitutes. They are complementary products—products that are consumed together by some and separately by others. A medical oncologist cannot offer what a radiation oncologist offers and vice versa but, together, they can offer a unique combination of services unavailable from either practitioner working alone.

governmental insurance programs. *See* DE1:7 ¶ 19. These entities set reimbursement rates for various types of services. A business like FCS, which is not a manufacturer that can easily make more products at the same or a lower marginal cost, does not have the power to fix prices through territorial allocations. Without that power, the unreasonableness of allocating territories cannot be assumed from cases decided in wholly unrelated contexts where that power did in fact exist.

The markets for medical oncology services and for radiation oncology services are nothing like products markets, and the Supreme Court has repeatedly cautioned against mechanically applying precedents from products markets to professional services markets:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. *The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.*

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788 (1975) (emphasis added); *accord National Society of Professional Engineers v. United States*, 435 U.S. 679, 694 (1978) ("We adhere to the view expressed in *Goldfarb* that, by their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary.").

The Supreme Court's warnings about the uniqueness of professional services markets are especially pertinent in this case because territorial allocations do not

11

necessarily harm competition in the circumstances alleged. In products cases like *Topco Associates*, it is fair to assume, for example, that, if more grocers could sell Topco-brand canned peas, Topco would can more peas, benefitting consumers with more choices and lower prices. That is a reasonable assumption if one believes that the demand for private-label canned peas is constrained primarily by price. The demand for cancer treatment is not similarly affected by price. Only people with cancer buy cancer treatment. Whether cancer patients can afford treatment depends not on the price but overwhelmingly on whether they have health insurance, as the Supreme Court has noted. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 349 n.7 (1982). Thus, there is no reason to take it on faith that, if FCS offered radiation oncology treatment at more of its clinics, more cancer patients would get treatment or prices would fall.

There is no reason even to suppose that FCS *can* offer radiation oncology at more clinics. Typically, a mass manufacturer can cheaply make more of its products. It can print more books, can more peas, or make more mattresses and recover its costs soon by selling the finished product. In contrast, for every additional clinic providing radiation oncology services, FCS would have to make enormous capital expenditures. It would have to buy extremely expensive equipment; hire radiation oncologists, physicists, and support staff; and acquire the space to accommodate the machines, doctors, physicists, staffers, and patients. Whether that would be profitable depends on whether Florida's demand for radiation oncology services is not now being met by other practice groups, hospitals, and healthcare networks throughout the state. If more peas are canned and available more cheaply, people will eat more peas. Having more cancer treatment centers, however, does

12

not provide any incentive for more people to purchase cancer treatment.

Additionally, there is no basis to assume that FCS's offering more radiation oncology services would push prices down. That depends, for one thing, on how many qualified radiation oncologists and physicists there are that can be hired. While Topco Associates can always hire and train more workers to can more peas, the indictment does not allege that there is any number of unemployed radiation oncologists and physicists looking for work. If the labor market for those scientific professionals is constrained by the opportunities available to get the requisite highly specialized training, FCS engaging in a hiring spree could drive costs *up*, not down, because it would be pulling radiation oncologists from other counties in Florida (or from other states) into the three counties the government has chosen to examine in isolation.

The indictment ignores these substantial and significant differences between the markets for mass-produced goods and specialized medical services in purporting to allege a *per se* violation of the Sherman Act. It simply relies on the legal catchphrase "territorial allocation" to bridge over the leaps of illogic on which its theory is built. The Supreme Court has held, however, that in the Sherman Act context "easy labels do not always supply ready answers." *Broadcast Music*, 441 U.S. at 8 (1979). What is *per se* illegal in the market for certain goods is not so for other goods or services.

*Broadcast Music*, for example, upheld blanket licenses for copyrighted music, even though they entailed horizontal price fixing, because the market for use of copyrighted music is nothing like a consumer goods market. "Most users want unplanned, rapid, and indemnified access to any and all of the repertory of compositions, and the owners want a

13

reliable method of collecting for the use of their copyrights. Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers." *Id.* at 20.

The Eleventh Circuit has applied this cautionary principle against facile resort to the *per se* approach specifically to the sort of restraint the indictment alleges: "Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the *per se* rule applies." *Procaps*, 845 F.3d at 1083 (citation omitted). Particularly in a criminal prosecution, there is no legal ground for expanding the list of *per se* § 1 violations until many cases involving the same type of restraint *in the same kind of market* proves the designation is merited. *Cf. California Dental Association v. FTC*, 526U.S. 756, 774 (1999) (holding that "restrictions on professional advertising [in a healthcare services context] could have different effects from those 'normally' found in the commercial world" and requiring a rule of reason analysis); *Procaps*, 845 F.3d at 1083 (holding that courts should apply the rule of reason rather than a *per se* approach when a familiar restraint of trade arises "in a new factual context with which we [do] not have a great deal of experience").

The government's assumption that FCS would offer radiation oncology treatment in Lee, Collier, and Charlotte counties but for the alleged agreement is purely speculative. The same is true about its assumption that radiation oncology is an elastic service—one for which demand rises when the price falls. Likewise for the assumption that Lee, Collier, and Charlotte counties need or want more radiation oncology providers. The economic laws governing the markets for mass-produced goods do not apply in the same

14

ways to a market for specialized professional services where the critical inputs, including highly and uniquely skilled labor, are constrained by forces outside the seller's control. Because the indictment fails to allege sufficient facts to support criminal liability under the *per se* rule, the only theory of prosecution under the Sherman Act it purports to charge, it fails to charge an offense.

## CERTIFICATE OF SERVICE

Counsel certifies that this motion was served on all counsel using the Court's CM/ECF system on October 9, 2020.

Respectfully submitted,

| | |
|---|---|
| **ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP** <br> 2000 K Street, N.W., 4th Floor <br> Washington, DC  20006 <br> Tel:  (202) 775-4514 <br> Fax: (202) 775-4510 <br> By:     /s/ Barry J. Pollack <br>          Barry J. Pollack <br>          Jessica Arden Ettinger <br>          *admitted pro hac vice* | **MARKUS/MOSS PLLC** <br> 40 N.W. Third Street <br> Penthouse One <br> Miami, Florida 33128 <br> Tel: (305) 379-6667 <br> Fax: (305) 379-6668 <br> dmarkus@markuslaw.com <br> <br> By:     /s/ David Oscar Markus <br>          David Oscar Markus <br>          Florida Bar Number: 119318 |