UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


UNITED STATES OF AMERICA


v.                                    CASE NO. 2:20-cr-00115-VMC-MRM


WILLIAM N. HARWIN



**<u>TRIAL MEMORANDUM OF THE UNITED STATES</u>**

Mark C. Grundvig
F. Patrick Hallagan
Eun-Ha Kim
Aidan D. McCarthy
William J. Vigen
    Attorneys, Antitrust Division
    U.S. Department of Justice

This brief provides a general framework for some of the legal and evidentiary issues that the government anticipates will arise at trial. The evidence that the government will seek to introduce includes co-conspirator and other non-hearsay statements, both oral and written. The bulk of the documentary evidence consists of emails and text messages between co-conspirators, including Defendant. The government also plans to introduce summary evidence to simplify exhibits and ease jury viewing as provided under Federal Rule of Evidence 1006 and summary testimony.

## I.    SUMMARY OF THE GOVERNMENT'S CASE

The indictment charges that from 1999 and continuing through at least September 2016, Defendant Dr. William Harwin knowingly participated in a *per se* unlawful market allocation conspiracy, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. As founder and leader of an oncology practice, Florida Cancer Specialists & Research Institute ("FCS"), Defendant conspired with members of his own business as well as those of another oncology practice, 21st Century Oncology ("21C"), to allocate medical oncology treatments to FCS and radiation oncology treatments to 21C. [1] His primary co-conspirator was the founder and leader of 21C, Dr. Daniel Dosoretz, who will testify at trial.[2] While FCS provided radiation oncology and 21C provided medical oncology to cancer patients elsewhere in Florida, within Collier, Lee, and Charlotte counties in Florida ("Southwest

---

[1]The indictment refers to 21C as "Oncology Company A."
[2]The indictment refers to Dosoretz as "Individual 1."

1

Florida"), they stayed within the lanes prescribed by the allocation conspiracy. During the conspiracy, FCS and 21C prospered, dominating the provision of oncology services to patients in Southwest Florida.

## II.     ELEMENTS OF THE OFFENSE

Section 1 of the Sherman Act outlaws every "conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The charged offense has three elements: (i) a conspiracy in restraint of trade, in this case, a *per se* unlawful conspiracy to allocate medical oncology treatments for cancer patients to FCS and radiation oncology treatments for cancer patients to 21C; (ii) the defendant knowingly joined the conspiracy; and (iii) the conspiracy and the business activities related to it were within the flow of, or substantially affected, interstate trade and commerce.

### A. *Per Se* Market Allocation in Southwest Florida

As this Court (Judge Badalamenti) recognized, Defendant "is charged with entering into a horizontal market allocation agreement—one of the oldest practices the Supreme Court has held to be *per se* illegal under the Sherman Act." Order (ECF No. 75 at 16). Because the charged conspiracy in restraint of trade in this case is a horizontal market-allocation agreement—that is, an agreement between competitors or potential competitors not to compete over the provision of radiation and medical oncology treatments, which is thus *per se* unlawful—further inquiry into the restraint's purpose or effects is unwarranted. *See* Gov't's Opp. to Def.'s Mot. to

Dismiss the Ind. (ECF 40 at 3-20); *see also United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088-90 (5th Cir. 1978)[3]; *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam).  On February 24, 2021, the Court (Judge Badalamenti) agreed and denied Defendant's motion to dismiss arguing that the indictment failed to allege a *per se* violation of the Sherman Act; the "Court has no choice but to reject Dr. Harwin's argument and assume that the practices alleged in the indictment are governed by the *per se* rule set forth in *Topco*." Order (ECF No. 75 at 10-12).

As a result, to establish this first element, the government need prove only the existence of the charged conspiracy among potential competitors, in this case the two oncology practices FCS and 21C acting though their leaders and other agents including the Defendant and Dr. Dosoretz, to allocate medical and radiation oncology treatments between them in Southwest Florida.  It need not prove a conspiracy to eliminate all competition between them, a conspiracy that included all competitors, or a conspiracy that had an anticompetitive effect or no business justification. *See United States v. All Star Indus.*, 962 F.2d 465, 474 (5th Cir. 1992) (holding that jury instructions in accordance with the *per se* rule were proper).

Lastly, horizontal market allocation agreements need not involve competitors who previously competed against one another.  *Palmer*, 498 U.S. at 49-50 (noting

---

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit as that court existed on September 30, 1981 are binding precedent in the Eleventh Circuit).

that "[t]he defendants in Topco had never competed in the same market, but had simply agreed to allocate markets" (citing *Topco*, 405 U.S. at 596)).  In determining whether there is a "'horizontal' agreement," "no distinction is made between actual competitors (i.e., those currently competing in the same market) and potential competitors." *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1314 n.34 (S.D. Fla. 2005) (citing *Palmer*, 498 U.S. at 46-48).

FCS and 21C were potential competitors within Southwest Florida because FCS was able to expand into radiation oncology and 21C was able to expand into medical oncology, as each had done elsewhere in Florida.  Specifically, they each had developed integrated cancer centers offering both radiation and medical oncology in different parts of Florida outside of the target area in the conspiracy, and each company had hired doctors and management with the expertise to expand into radiation oncology and medical oncology.  Secondly, direct competitors to FCS and 21C included oncology practices offering both types of oncology services; therefore, the existence of integrated practices illustrates the potential competitive nature between FCS and 21C.  Lastly, the existence of the market allocation agreement demonstrates that they were potential competitors.  "To some extent, of course, a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus its very existence supports an inference that it would have an effect in a relevant market." *United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir. 1986).  The observation of the *Sargent* court is especially

applicable in this case where the Defendant actively and directly intervened when he believed 21C was making decisions that encroached on FCS' medical oncology "turf."

## B. Defendant Knowingly Participated in the Conspiracy

When the charged offense arises from conduct which is *per se* illegal, to meet its burden of proof regarding Defendant's intent, the Government need prove only that Defendant knowingly—meaning voluntarily and intentionally—joined the alleged conspiracy to allocate radiation and medical oncology treatments. *United States v. Giordano*, 261 F.3d 1134, 1143-44 (11th Cir. 2001) (affirming convictions where "jury was instructed that in order to return guilty verdicts it had to find that Appellants 'knowingly joined a conspiracy to fix prices or allocate customers'"); *see United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("In cases involving behavior such as bid rigging, which has been classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" (quoting *United States v. Brighton Building & Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979)).

The government is not required to prove that the defendant knew his actions were illegal or that he specifically intended to restrain trade or violate the law. *United States v. Cargo Service Stations*, 657 F.2d 676, 681-684 (5th Cir. Sept. 28, 1981); *All Star Industries*, 962 F.2d at 474 n.18; *United States v. MMR Corp.*, 907 F.2d 489, 495 (5th Cir. 1990). Similarly, when there is a *per se* illegal agreement, it is not a defense that

anti-competitive effects were lacking or that defendant's motives were benevolent. *All Star Industries*, 962 F.2d at 475 n.21.

Furthermore, knowing participation need not be proved by direct evidence and can be inferred from the facts and circumstances of the cases. *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975); s*ee also Cargo Service Stations*, 657 F.2d at 680; *United States v. Metropolitan Enterprises*, 728 F.2d 444, 450-51 (10th Cir. 1984); *United States v. Young Bros., Inc.*, 728 F.2d at 687 n.6 (5th Cir. 1984); *United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 126-27 (7th Cir. 1978).

## C. Interstate Trade and Commerce

With enactment of the Sherman Act, "Congress intended to exercise the full sweep of its power in making illegal '(e)very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *Cadillac Overall Supply Co.*, 568 F.2d at 1083. And, as "has been repeatedly demonstrated, the constitutional power of Congress to regulate commerce is a broad power, even encompassing the growing of wheat for consumption by one's family." *Cargo Service Station*, 657 F.3d at 680. In order to establish the third element, the government may prove a nexus between interstate commerce and the defendant's business activities under either of two independent theories: (1) the "in commerce" theory, or (2) the "effect on commerce" theory. *See McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 242 (1980); *Young Bros., Inc.*, 728 F.2d at 688; *Cargo Service Stations, Inc.*, 657 F.2d at 679; *Cadillac Overall Supply Co.*, 568 F.2d at 1082.

The "in commerce" theory requires the government to prove that the business activities in question are an integral part of an interstate transaction and are inseparable from their interstate aspects. *McLain*, 444 U.S. at 244. For example, goods that were shipped from out-of-state suppliers were deemed to be within the "flow of commerce" until it reached the ultimate consumers. *Cadillac Overall Supply Co.*, 568 F.2d at 1084-5.

The "effect on commerce" theory requires the government to prove that the relevant business activities, in this case, the provision of oncology treatments by 21C and FCS, had a not insubstantial effect on interstate commerce or would have had such an effect, if the conspiracy had succeeded. *Shahawy v. Harrison*, 778 F.2d 636, 638–39 (11th Cir. 1985), amended, 790 F.2d 75 (11th Cir. 1986); *McLain,* 444 U.S. at 246; *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991) ("[B]ecause the essence of any violation of § 1 is the illegal agreement itself—rather than the overt acts performed in furtherance of it, proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy were successful.") (citation omitted).

A conspiracy can still substantially affect interstate commerce even without proof of increased prices or proof of greater quality in the absence of the restraint. *See Cadillac Overall Supply Co.*, 568 F.2d at 1085 ("[I]n the context of horizontal territorial market divisions that, as a matter of practical economics, a substantial adverse affect on interstate commerce results by virtue of the restraint, itself"); *see also Summit Health,* 500 U.S. at 329 (1991) (holding that the effect on interstate commerce

7

was established by the hospital's purchase of out of state medicines and supplies as well as its revenues from out-of-state companies); *United States v. Aquafredda*, 834 F.2d 915, 918 (11th Cir. 1987) (holding interstate element on effect on commerce theory satisfied by evidence showing defendants purchased trucks, materials and supplies from out of state which were worth hundreds of thousands of dollars, that checks were drawn on out-of-state banks and mailed across state lines by out-of-state corporations, and that at least one of the customers directly engaged in interstate commerce). Furthermore, in *McLain*, the Supreme Court held the Sherman Act does not require that "unlawful conduct itself [have] an effect on interstate commerce," or that a plaintiff must quantify the adverse impact of a defendant's anti-competitive activities for jurisdictional purposes. *McLain,* 444 U.S. at 243.

## III. EVIDENTIARY ISSUES

During the trial, the government seeks to introduce out-of-court statements and summary evidence. Written and oral out-of-court statements will be admissible as: (1) Defendant's admissions; (2) co-conspirator statements; (3) business records; (4) verbal acts; (5) statements not for the truth of the matter asserted; and (6) a combination thereof. Oftentimes, communications between Defendant and his co-conspirators were circulated amongst a group. Due to the quantity of out-of-court statements the government plans to introduce (mainly e-mails and text messages), this brief describes each of these categories along with illustrative examples.

## A.    Defendant's Admissions

Many of the communications that the government will seek to introduce will consist of Defendant's own statements, which are admissible as non-hearsay opposing party statements.  Fed. R. Evid. 801(d)(2)(A).  For example, relating to 21C's acquisition of SIU/Premiere, Defendant sent an email directing[4] his co-conspirator Dr. Dosoretz to make the medical oncologists acquired in 21C's acquisition of SIU/Premiere "disappear."  Gov. 75.

## B.    Co-Conspirator Statements

Out-of-court statements made by a defendant's co-conspirators under Rule 801(d)(2)(E) are not hearsay and are admissible for the truth of the matter asserted when it is shown by a preponderance of the evidence: "(1) that there was a conspiracy (2) that included the declarant and the defendant, and (3) the subject statements were made during the course and in furtherance of the conspiracy." *United States v. Amede*, 977 F.3d 1086, 1097 (11th Cir. 2020); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

A court "is not bound by evidence rules, except those on privilege" in determining the admissibility of a co-conspirator statement. Fed. R. Evid. 104(a).  A court must consider the statement itself, and may also consider, among other things, hearsay evidence or evidence not admitted at trial.  *Bourjaily*, 483 U.S. at 179-81; *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002).  The statement "must be

---

[4] Defendant's directive is also an example of a non-hearsay verbal act, which is not offered for its truth of the matter asserted.

considered" in determining its admissibility although it "does not by itself establish … the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2).

In admitting a co-conspirator statement, the government is not required to demonstrate the unavailability of the declarant, nor is any "independent indicia of reliability" required. *Byrom*, 910 F.2d at 735. Moreover, a co-conspirator statement is not "testimonial" and therefore does not give rise to concerns under the Sixth Amendment's Confrontation Clause. *United States v. Underwood*, 446 F.3d 1340, 1347-48 (11th Cir. 2006).

One of many co-conspirator statements the government seeks to introduce includes an email sent by 21C's Dr. Mantz.[5] During the course of the conspiracy, with Dr. Mantz in a position of leadership, 21C avoided certain opportunities to serve patients because doing so would violate the conspiratorial agreement between FCS and 21C. At the time Humana dropped FCS from its network, FCS held nearly a complete monopoly for medical oncology treatments in Southwest Florida. Without FCS in Humana's network, 21C recognized that Humana patients in Southwest Florida would no longer have any medical oncology treatment options available within network. In a February 2015 email, Dr. Mantz explained to another 21C radiation oncologist that 21C could not hire its own medical oncologists to cover the needs of FCS's patients despite the Humana termination because "Danny

---

[5]Dr. Constantine Mantz was a 21C radiation oncologist and has held various leadership positions at 21C, including Director of Research, Director of Southwest Florida Radiation Oncology Operations, Senior Vice President of Medical Operations, and Chief Medical Officer.

[Dosoretz] and Bill [Harwin] have a gentleman's agreement not to tread on each other's turf." Gov. 254. As will be explained below, this particular statement by Dr. Mantz qualifies as a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E).

Another co-conspirator example includes a statement by Jeffery Esham, FCS Vice President of Radiation Oncology and Radiology, about the "handshake agreement" with 21st Century. Esham's statement arose out of a January 2013 visit to FCS by a radiation oncologist from the East Coast of Florida who spoke with Esham and FCS CEO Brad Prechtl. After that visit, the radiation oncologist thanked them via email and mentioned that "part of your historical success is due to the fact that you've 'stayed in your lane' of heme/onc practices." Gov. 72. In the same email chain, referencing their conversations, the radiation oncologist wrote "21st Century does not have a presence yet in Palm Beach county… so there should be minimal friction from that perspective" and proposed expanding FCS's radiation oncology into Lee, Collier or Charlotte counties. *Id.* In April 2013, rejecting that proposal, Esham wrote: "Basically we cannot consider anything together at this time as we do not have any sites without radiation oncology that are north of Bradenton. Please recall that the majority of our clinics are Bradenton south and we have the handshake agreement with 21st Century." Gov. 73. As will be explained below, this particular statement by Esham qualifies as a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E).[6]

---

[6] Esham's email is also properly admissible as a business record and pursuant to other hearsay exceptions.

### 1.    There was a conspiracy

To meet the elements of a co-conspirator statement, the government must demonstrate the existence of a conspiracy by a preponderance of the evidence. Evidence of the conspiracy to allocate radiation and medical oncology treatments will include testimony by former 21C CEO Dr. Dosoretz.[7] Additionally, FCS entered into a Deferred Prosecution Agreement with the Department of Justice, admitting that, through Defendant as "its former president and managing physician," and others, it conspired with 21C, to "suppress and eliminate competition by agreeing to allocate medical oncology treatments and radiation oncology treatments for cancer patients in Southwest Florida, reserving medical oncology for FCS and radiation oncology for [21C]." DPA at 20.[8] Dr. Dosoretz's testimony regarding the conspiracy and FCS's Deferred Prosecution Agreement alone show by a preponderance of the evidence that a conspiracy existed, but its existence is also supported by the co-conspirator statements.

### 2.    The conspiracy included the declarant and Defendant

Once the conspiracy has been established, only slight evidence is needed to connect additional participants to it. *Cadillac Overall Supply Co.*, 568 F.2d at 1087. Also, any acts performed in furtherance of the agreement need not be illegal to bind a co-conspirator; they need only be acts for the purpose of forming or effectuating the

---

[7] The government is prepared to provide a copy of Dr. Dosoretz's grand jury testimony under seal upon the court's request.
[8] DPA is attached as Exhibit A.

conspiracy. *United States v. LaChance*, 817 F.2d 1491, 1494 (11th Cir. 1987). Although "mere knowledge" of the existence of the conspiracy may not constitute "membership" in the conspiracy, "acquiescence" may be deemed participation so as to establish a defendant's culpability. *See, e.g., United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 146 (1948).

Therefore, taking the Dr. Mantz email above as an example, the government would show by a preponderance that both the declarant, Dr. Mantz, and Defendant were involved in the conspiracy. As already addressed, Defendant played a central role in the conspiracy's formation and execution, while as addressed here Dr. Mantz played a supporting yet knowing role to maintain the allocation conspiracy. In 2010, in response to 21C's fear that FCS would combine with Premiere/SIU, thereby posing a competitive threat to 21C in the provision of radiation oncology treatments, Dr. Mantz suggested to 21C doctors that he would "talk with [FCS's] Rodriguez and politically try to get him understand [sic] our perspective of likely events" if FCS offered radiation oncology and have Dr. Rodriguez "report back to his people" at FCS. Gov. 11. In 2012, Defendant complained to Dr. Dosoretz about 21C's administering the drug Provenge: "Ur using poor judgment and competing against us." Gov. 48. Dr. Dosoretz forwarded Defendant's complaint to Dr. Mantz. *Id.* Dr. Mantz responded that he had spoken with "Frank [Rodriguez], about the same thing last week . . . I guess Frank couldn't deal with it and went to Bill [Harwin]." *Id.* In the proffered statement from February 2015, Dr. Mantz specifically referenced the "gentleman's agreement not to tread on each other's turf." Gov. 254. And in

October 2015, Dr. Mantz rejected the idea of 21C's participating in a clinical cancer study, noting: "We do have patients for this study, but we would be perceived by FCS as treading on their turf… We'll have to pass on this one." Gov. 262.

In addition to this documentary evidence, Dr. Mantz will testify to his knowledge of the allocation agreement.[9] Dr. Mantz will testify that he understood the agreement to mean that neither 21C or FCS would practice in each other's field of oncology. 21C agreed to only practice radiation oncology; conversely, FCS agreed to only practice medical oncology. Dr. Mantz will testify that the two companies stayed in their own service lines and did not compete, which meant that 21C did not hire medical oncologists.

Jeffrey Esham too acted as a member of the conspiracy. As his exemplar demonstrates, Esham was aware of the gentleman's agreement between FCS and 21C. He also acted to advance the interests of the conspiracy by rejecting an individual's interest in expanding FCS's radiation footprint inside Southwest Florida. That signaling deterred competition and assisted in maintaining the agreement between FCS and 21C, and therefore, Esham was a member of the conspiracy.

### 3. Subject statements were made during the course and in furtherance of the conspiracy

Statements satisfying Rule 801(d)(2)(E) include those that: further the interests of the conspiracy; solicit membership or participation in the conspiracy;

---

[9] The government is prepared to provide a copy of notes taken by the FBI during an interview with Dr. Mantz upon the court's request.

explain the conspiracy to a new member; provide reassurance to co-conspirators; maintain trust and cohesiveness among co-conspirators; inform co-conspirators of the current status of the conspiracy, *Turner*, 871 F.2d at 1581; affect future dealings between co-conspirators, *United States v. Wenxia Man*, 891 F.3d 1253, 1271 (11th Cir. 2018); and facilitate communication among co-conspirators to engage in the unlawful ends of the conspiracy, *United States v. Dickerson*, 248 F.3d 1036, 1050 (11th Cir. 2001).

The conspiracy to allocate the oncology market between 21C and Defendant's practice endured for at least 17 years. Again, for example, the evidence will show Dr. Mantz's coordination with FCS in 2010, well after the formation of the conspiracy. Gov. 14. By February 2015, evidence will show that Dr. Mantz referred directly to the agreement between Defendant and Dr. Dosoretz. Gov. 254. Furthermore, Dr. Mantz sent the February 2015 email to a doctor within 21C while copying Dr. Dosoretz on the "gentleman's agreement." *Id.* Therefore, this particular statement served a variety of functions for the conspiracy: it furthered the interests of the conspiracy, provided reassurance to co-conspirators, maintained cohesiveness between co-conspirators, informed co-conspirators of the current status of the conspiracy, affected future dealings between co-conspirators, and facilitated communication among co-conspirators.

Likewise, in evaluating the co-conspirator exemplar by Esham, the evidence demonstrates that Esham referred explicitly to the agreement between Defendant and 21C. Gov. 73. That email was sent in 2013 during the course of the charged

conspiracy.  This particular example furthered the interests of the conspiracy, by explaining to an outsider FCS's interest in staying within its lane of medical oncology and not intruding into 21C's lane of radiation oncology, and was used as a basis for rejecting a proposal for FCS to provide radiation services in Southwest Florida.  It also maintained cohesiveness and further entrenched the understanding between co-conspirators, namely Esham and Prechtl.

In addition to examples involving Dr. Mantz and Esham, other statements which the government will introduce as non-hearsay co-conspirator statements include those made by FCS doctors Joel Grossman, Doug Heldreth, Julio Lautersztain, Mark Moskowitz, Mark Rubin, Frank Rodriguez, and Shalin Shah.

### C.     Non-Hearsay Business Records

Other statements fall within the business records exception to the rule against hearsay. Fed. R. Evid. 803(6).  Many of the co-conspirator communications are emails or text messages among doctors discussing business decisions about which drugs or procedures 21C or FCS should offer and are thus "made in the course of a regularly conducted business activity" rather than "unique responses to unusual or isolated events."  *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 954785, at *4 (N.D. Fla. Mar. 14, 2021) (quoting *Lion Oil Trading & Transp. Inc.*, No. 98 Civ. 11315, 2011 WL 855876, at *6 (S.D.N.Y. Feb. 11, 2011)); *see Palmer v. Hoffman*, 318 U.S. 109, 112-114 (1943).

Moreover, "routineness or repetitiveness with which a record is prepared is not the touchstone of admissibility" under Rule 803(6).  *United States v. Jacoby*, 955

F.2d 1527, 1537 (11th Cir. 1992). Rather, "[n]onroutine records made in the course of a regularly conducted 'business' should be admissible if they meet the other requirements of Rule 803(6)," unless circumstances indicate a lack of trustworthiness. *Id.* Witnesses from 21C and FCS will provide a basis for finding that the requirements of Rule 803(6) are met. Those witnesses "do[] not need firsthand knowledge of the contents of the records, of their authors, or even of their preparation" to establish their trustworthiness. *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1268 (11th Cir. 2015).

The examples noted herein, the statements written by Dr. Manz and Esham, meet the requirements of non-hearsay business records. Dr. Manz's statements about the use of certain drugs and drug trials refer to business decisions made in the regular course of his business activity as a doctor at 21C. Likewise, Esham's statements made to an outside doctor about FCS's approach with 21C and planning radiation oncology expansion were made in the regular course of his business activity as Vice President of Radiation Oncology.

### D.    Verbal Acts

Statements constituting "verbal acts" or offered to show effect upon the listener or the speaker's state of mind are not offered for their truth and thus are not inadmissible hearsay. *See* Fed. R. Evid. 801(a), (c); *Lutwak v. United States*, 344 U.S. 604, 617 (1953). Words of agreement are examples of a "verbal act," and their admissibility is not affected by the hearsay rule. *See* 2 Robert P. Mosteller et al., *McCormick on Evidence* § 249, n.6 (8th ed. 2020). When a person directs, orders or

instructs another person to perform or refrain from performing an act, such statements are generally not capable of being either true or false, and therefore are typically not offered for the truth of the matter asserted. *See United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986). In *Cruz*, the Eleventh Circuit held that a declarant's statement to "bring your supplier" was admissible because "[i]t is more in the nature of an order or a request and is, to a large degree, not even capable of being true or false. The statement is offered solely for the fact that it was made and the effect it might have had upon its hearer." *Id.*

By way of example, the United States will seek to admit an email containing the following statements of FCS's Dr. Lautersztain: "We should contact Danny [Dosoretz] and ask for the rights to Hillsborough county as part of your handshake deal… we need to make explicit to Danny [Dosoretz] if they buy Oncure that an incursion into Hillsborough should involve FCS and will not include medical oncology. You have to make this clear Bill [Harwin] as managing partner." Gov. 209. As this statement lies in the category of order or request, Dr. Lautersztain's statement will be introduced as a verbal act of a co-conspirator.

These statements are admissible as verbal acts that are probative of the existence of a conspiracy, the speaker's state of mind, or and the effects they might have upon the persons who heard them. *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986); *United States v. Miller*, 771 F.2d 1219, 1233 (9th Cir. 1985) (statements made by co-conspirator warning another to keep his prices higher were non-hearsay).

### E. Statements Not for the Truth of the Matter Asserted

Similarly, some of the anticipated statements also do not constitute hearsay because they are offered "to place the investigation and [Defendant's] statements in context," rather than to prove the truth of those statements. *United States v. Makarenkov*, 401 F. App'x 442, 445 (11th Cir. 2010); *see also United States v. Price*, 792 F.2d 994, 997 (11th Cir. 1986) (holding that informant's statements in a taped conversation with a defendant "were not hearsay, but rather were offered to put into context" the statements of the defendant). Multiple emails in a thread will be introduced together to provide context for admissible non-hearsay statements by the Defendant or others contained within the email thread. Similarly, much like in an interview where it is necessary to admit questions in combination with answers for a statement to make sense, the back and forth nature of text messages necessitates introduction of the full conversation in order to provide a complete picture.

### F. Combination

The government anticipates that many of the out-of-court statements will be introduced under multiple grounds of admissibility. For example, an email sent by an FCS doctor which refers to the arrangement between FCS and 21C may be introduced as a co-conspirator statement, a verbal act, and a business record.

### G. Summary Evidence

The government also seeks to introduce summaries of (1) claims to and payments made from out-of-state insurance companies to 21C and FCS for oncology treatments rendered to insured individuals, (2) communications including text

messages between Defendant and his co-conspirators, (3) Defendant's financial compensation and FCS revenue, and (4) office locations in the form of maps. All are permissible under Federal Rule of Evidence 1006. Rule 1006 allows the use of "a summary chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Use of a summary exhibit is permissible so long as the underlying evidence is admissible and made available for "examination or copying" by other parties. *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004). The underlying evidence need not itself be admitted. *Id.*

The summary of claims and payments fits squarely into the purpose of Rule 1006—it is a one-page summary of thousands of lines of data pulled from FCS's or 21C's records. A witness from each with requisite knowledge will testify to the authenticity of those records and such facts as to qualify them as business records excepted from the hearsay rule under Federal Rule of Evidence 803(6).

The communication summaries consist of a consolidation of emails and text messages during a limited period of time. Text messages were produced pursuant to subpoena with each individual text message occupying its own page. In other words, to examine a text conversation between senders the jury would have to flip, one-by-one, through many individual exhibits containing just a few lines of text per page. Summaries of communications are appropriate here as courts do not treat Rule 1006's requirement that records be "voluminous" literally, instead holding that it "allows the district court to admit the summaries as evidence where, in the court's

discretion, it would be inconvenient or unnecessarily time-consuming" to present

each item individually. *United States v. Francis*, 131 F.3d 1452, 1457 (11th Cir. 1997)

(allowing admission of summaries of seventy-six taped conversations to prevent

having to play each one for the jury individually). And, as with the summary of

payments, an FCS witness with requisite knowledge will testify to the authenticity of

the underlying text messages and emails and qualify them as business records, in

addition to their admissibility as Defendant's own statements or the statements of co-

conspirators.

A summary of financial statements relating to compensation is also within the

purpose of Rule 1006. The evidence introduced will be a summary of data points

from FCS financial statements in graphic form to demonstrate the change and

growth over time of FCS revenue and Defendant's compensation. A witness from

FCS with requisite knowledge will testify to the authenticity of those underlying

financial records and such facts as to qualify them as business records excepted from

the hearsay rule under Federal Rule of Evidence 803(6).

Lastly, the government seeks to introduce summaries of the office locations of

21C and FCS in the state of Florida which will demonstrate where medical oncology

and radiation oncology services were offered in the form of maps. These summary

maps are a more convenient and informative method to illustrate locations rather

than lists, which fail to show where offices are situated relative to each other. Again,

witnesses from FCS and 21C with requisite knowledge will testify to the authenticity

of such facts underlying the maps as to qualify them as business records excepted from the hearsay rule under Federal Rule of Evidence 803(6).

## H.   Summary Testimony by Case Agent

The government intends to present limited summary witness testimony in its case-in-chief through an FBI Special Agent.  Courts routinely permit law enforcement officers to testify as lay witnesses based on knowledge gained in the course of an investigation.  The Eleventh Circuit has "never held that a lay witness must be a participant or observer of a conversation to provide testimony" about it. *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011).  Rather, testimony of a case agent may be rationally based on their perception of documents reviewed in the course of an investigation.  *Id.* at 1103; *United States v. Hamaker*, 455 F.3d 1316, 1331-32 (11th Cir. 2006); *United States v. Gold*, 743 F.2d 800, 817 (11th Cir. 1984).

Although the case agent will not expand nor alter the plain language presented in limited texts or email evidence, the case agent's testimony can serve to connect pieces of evidence introduced through different witnesses at different points in the trial together.  *See U.S. v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983).  The agent's knowledge of the investigation will help the jury better understand Defendant's conversations with his co-conspirators and put those words in context of other admitted evidence.  *See Jayyousi*, 657 F.3d at 1103.  The case agent can provide, for example, a clear timeline so that documents in evidence can be referenced against particular events.  Also, although the government expects other witnesses directly involved in the use to testify as to certain abbreviations or truncated words, the case

agent would be able to remind the jury that med onc, for example, stands for medical oncologist.

Dated: August 16, 2022         Respectfully submitted,

<u>/s/ Eun-Ha Kim</u>
Eun-Ha Kim (NY Bar No. 4589651)
Mark C. Grundvig (DC Bar No. 461580)
F. Patrick Hallagan (IL Bar No. 06269887)
Aidan D. McCarthy (MD Bar No. 2012170240)
William J. Vigen (DC Bar No. 997316)
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW
Washington D.C. 20530
Tel: (202) 805-8465
Eun-ha.kim@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on August 16, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have entered notices of appearance in this matter.

/s/ Eun-Ha Kim
Eun-Ha Kim
NY Bar No. 4589651
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW
Washington D.C. 20530
Tel: (202) 805-8465
Eun-ha.kim@usdoj.gov